**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| WASHINGTON PRIME GROUP INC., et al.[1] | Case No. 21-31948 (MI) |
| Debtors. | |
| | (Jointly Administered) |

**OBJECTION OF THE AD HOC COMMITTEE OF PREFERRED
SHAREHOLDERS TO DEBTORS' MOTION FOR ENTRY OF AN
ORDER (I) ESTABLISHING BIDDING PROCEDURES; (II)
SCHEDULING CERTAIN DATES WITH RESPECT THERETO,
(III) APPROVING THE FORM AND MANNER OF NOTICE
THEREOF, AND (IV) GRANTING RELATED RELIEF**

The Ad Hoc Committee of Preferred Shareholders (the "Ad Hoc Committee")[2] of

Washington Prime Group, Inc. (together with its debtor-affiliates, the "Debtors"), hereby submits

this Objection and Reservation of Rights  (the "Objection") to the *Debtors' Motion for Entry of an*

*Order (i) Establishing Bidding and Auction Procedures Relating to the Submission of Alternative*

*Plan Proposals, (ii) Setting a Hearing for the Approval of (a) the Successful Bidder and (b)*

*Authorization of Supplemental Solicitation Materials and (iii) Granting Related Relief* [Docket

No.. 27] (the "Motion" and the bidding procedures described therein, the "Bidding Procedures").[3]

In support of this Objection, the Ad Hoc Committee respectfully represents as follows:

---

[1] A complete list of each of the Debtors in these chapter 11 cases and the last four digits of their federal tax identification numbers may be obtained on the website of the Debtors' claims and noticing agent at http://cases.primeclerk.com/washingtonprime. The Debtors' service address is 180 East Broad Street, Columbus, Ohio 43215.

[2] The Ad Hoc Committee is comprised of: Cygnus Capital, Inc., Union Square Park Capital Management, LLC, and Daniel Lewis.

[3] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

## PRELIMINARY STATEMENT

1.      Approval of the Bidding Procedures in the form proposed at this stage is unnecessary and prejudicial.  The Bidding Procedures provide no meaningful protection or enhancement to the Debtors' businesses or any stakeholder recoveries in these cases. Instead, they are merely a device to attain the *fait accompli* contemplated by Restructuring Support Agreement's ("RSA") of enabling a small group of four debt holders to wipe out existing equity while, at the same time, siphoning off the residual value of a company that appears likely to have been solvent as of the petition date and is positioned to benefit from a continuing broad economic recovery.  As set forth below, the proposed Bidding Procedures provide for an inadequate time period to market the Debtors' wide ranging portfolio of assets, provide unfair advantages to the putative acquirer SVP Global ("SVP" or the "Plan Sponsor"), unnecessarily and unfairly constrain the bidding process to a very narrow, and likely unachievable, definition of what is an "Acceptable Bid", and thus will not maximize value.

2.      It is imperative that the Debtors do not embark upon a value destructive sale process and capitulate to one bidder at the expense of the estate and public equity holders. Only with additional time for a full and fair bidding process, and a broader definition of Acceptable Bids to permit for alternative value-maximizing proposals, will the bidding process provide maximum value to be attained for the stakeholders and provide a measure of fair market value.  The manner in which the current bidding process is structured ensures that the results achieved will not be a true indication of the fair market value of the Debtors' assets or enterprise.

3.      The Ad Hoc Committee has only recently been formed but, since its formation, has focused on preserving and maximizing value and ensuring a fair and equitable process.  The Bidding Procedures (and the RSA) being proposed were negotiated in an exploitive manner, during

the depths of the worst worldwide pandemic in over 100 years, and absent material changes, lead only to one place: the transfer of significant value from public equity holders to the Plan Sponsor.

4.      As explained below, the proposed bidding rules do not allow the estate to obtain maximum value as the Bidding Procedures have been sharply crafted to require only one primary formulation of a bid: at least $2.3 billion in cash. However, the Plan Sponsor is deemed a "Qualified Bidder" even though its "Qualified Bid" pays no more than $325 million in cash and instead is primarily comprised of reinstating and assuming debts. As a result, the "go shop" process and proposed bidding rules are inherently unfair, skewed in favor of one bidder, and fundamentally flawed. Further, the proposed aggregate $40 million to equity holders in "death trap" plan consideration is highly coercive, and a significant discount to the recent valuation of the Company's equity securities as of the Petition Date. On June 14, 2021, the market value of the Debtors' equity securities was approximately $115 million: preferred equity was approximately $32 million and the market value of the common equity was approximately $83 million.[4]

5.      The Debtors allege that this case requires an expedited timeline but that contention is false, and is nothing more than a self-created emergency dictated by the RSA. The narrative of emergency and the need for speed, while often true in chapter 11 cases, is not true in this case and rests on four central fallacies:

6.      **First**, unlike many cases, this case does not present the often seen "melting ice cube" problem. In fact, the Debtors' business has become stronger, not weaker, with the pandemic in the rear view mirror and the economy rebounding strongly. Retail stores, many closed or under operating restrictions for extended periods, are now open. Shoppers, once under lockdowns, have

---

[4] These values were obtained by looking at the prices on the NYSE exchange on June 14, 2021 (the first business day after the Petition Date).

returned to malls and shopping centers.  Foot traffic is up.  Consumer confidence has returned and

is on the rise.  Here, the DIP Budget reveals that the company has positive operating cash flow and

a recently publicly filed June 2021 Creditor Presentation forecasts Funds from Operations of over

$110 million for fiscal year 2021. Far from the "melting ice cube" situation that requires an

expedited process, the Debtors' recently filed Disclosure Statement [Docket No. 162]

acknowledges that:

> …macroeconomic trends are now starting to reverse course.  Indeed, all of the
> Debtors' properties have reopened since December 2020, and most retailers are
> now fully operational.  Consumer confidence increased dramatically in the first few
> months of 2021, rising 31.3 points from February 2021 to April 2021- the largest
> two month gain on record in over 50 years. This comes as many retail locations
> begin to see an increase in foot traffic, hiring, and growth expectations.  In fact,
> sales at retail stores and restaurants in March 2021 surged by 10% month over
> month and foot traffic at apparel stores in April rebounded to within 4% of April
> 2019 levels.  Many retails sales (including online) have also eclipsed pre-COVID-
> 19 levels on a month basis, and the National Retail Federation expects annual retail
> sales to grow between 6.5% and 8.2% in 2021."  Disclosure Statement at 2
> (citations omitted).

The expedited pace sought is not necessary and instead appears aimed at avoiding both scrutiny

and a fair, open and competitive process that will maximize value.

7.     **Second**, is the fallacy that the time should be accelerated because SVP and similarly

situated noteholders have magnanimously offered to "eliminate" their debts for the benefit of the

estate.  While this may often be a benefit in "underwater" cases, in this case, the plan seeks to

"eliminate" debt yet replace it with a far more valuable asset:  substantially all of the equity in the

reorganized company.    Of course, this is not allowed under basic notions of fairness or the core

tenets of the Bankruptcy Code.  *See In re MCorp. Financial, Inc.,* 137 B.R. 219, 235 (Bankr. S.D.

Tex.1992) ("creditors must not be provided for more than in full"); *In re Exide Technologies,* 303

B.R. 48, 61 (Bankr. D.Del.2003) ("a corollary of the absolute priority rule is that a senior class

cannot receive more than full compensation for its claims.").

8.     **Third**, and relatedly, is the issue of valuation. As set forth in the first day declaration in this case, the Debtors' CFO admitted that the Debtors have "grappled with an appropriate valuation for the Debtors' enterprise." *Declaration of Mark E. Yale, Executive Vice President and Chief Financial Officer of Washington Prime Group Inc., in Support of the Debtors' Chapter 11 Petitions and First Day Motions* (the "Yale First Day Declaration") [Docket. No. 26]. This admission is both commendable and understandable. As the Debtors' Disclosure Statement acknowledges (see above), stores are re-opening, tenant rents now able to be paid, and a turbo charged "reopening" economy evidence a valuation that is growing not declining. Based on several metrics (book value, public value of the equity securities, and general reopening economic trends) the Debtors appear likely have been solvent as of the Petition Date, beyond the range of $0.00–$40 million in "only if you vote yes" value being offered to equity holders in the coercive "death trap" structure of the proposed chapter 11 plan. As a result, rather than artificially truncate the marketing process and deprive the estate of value, a longer process and more level playing field will help eliminate uncertainty imposed by competing views of valuation that will continue to exist in this case, beyond the bid deadline and auction date. While valuation will be the central issue in this case and a contested valuation will require expert testimony, the following facts cannot be disputed. *First*, prior to the onset of the COVID-19 pandemic, as of November 29, 2019, the aggregate market value of the Debtors' equity was approximately **$945 million**, comprised of approximately $169 million in preferred equity value and approximately $776 million of common equity value. *Second*, the Debtors' March 31, 2021 balance sheets filed on SEC Form 10-Q evidence total assets of $4,028,916 and total liabilities and redeemable non-controlling interests of $3,470,908, and "total equity" of $554,683,000. *See, Washington Prime Group Inc. Form 10-Q for the Quarterly Period ended March 31, 2021*. Third, the Debtors' equity

on the New York Stock Exchange has been recently priced at values far in excess of the "plan value" of the very same equity. This disconnect is of serious concern and should be cause for the Debtors to exercise the "fiduciary-out" they properly negotiated for themselves in the RSA and in the bid procedures (explained below).

9.      **Finally**, is the fallacy of "extensive" pre-petition negotiations that resulted in the RSA. While extensive negotiations no doubt occurred, notably absent from those discussions were equity holders. Thus, the "hard fought" negotiations were missing the very parties whose interests were being extinguished. Moreover, despite the Debtors' assertion that there was "substantial time and effort" spent on prepetition marketing, it does not appear that there were, in fact, any such extensive marketing efforts.

10.     The proposed bidding procedures should not be approved in their current form and must be modified in order to gain the Court's approval. For the reasons set forth below, it is respectfully submitted that the Court should:

(i)     Require that the marketing and sale timeline be extended for at least sixty (60) additional days; and

(ii)    Allow bidders flexibility to submit any form of bid or alternative transaction (or set of transactions by multiple bidders) that will allow the Debtors' board of directors to exercise its fiduciary duties to consider and respond to all value maximizing proposals.

The $2.3 billion (plus) minimum cash bid effectively forces an enterprise purchase when that may not be the best way to maximize value. The Bidding Procedures should be structured in ways that allow adequate time to promote price discovery and combined bids on the assets individually, as groups (open air, enclosed mall, joint venture, and combinations thereof) as well as in a portfolio without the $2.3 billion cash hurdle. Similarly, other value maximizing alternatives may include alternative debt financing or refinancing structures as well other creative options which are not

contemplated by the Bidding Procedures.  Simply said, the current procedures and timeline would effectively shut the door on all of these options.

## BACKGROUND

11.     On February 12, 2021, the Debtors announced in a Form 8-k filing that, *inter alia*, seventeen senior employees including executive officers and designated vice presidents, would be prepaid approximately $11.6 million in annual incentive pay, subject to certain terms and conditions. *See* WPG Form 8-k dated February 12, 2021.

12.     On February 15, 2021, just three days later, the Debtors announced that would not make their coupon payment to holders of Unsecured Notes.

13.     Thereafter, a series of nine forbearance agreements were entered into between the Debtors, SVP and the Ad Hoc Lender Group, who are alleged to now hold approximately 74.5% of the 2018 Credit Facility, 62% of the 2015 Credit Facility, and 67.67% of the Unsecured Notes, and 100% of the Webstertown Term Loan Facility.

14.     On June 11, 2021, the Debtors SVP and the Ad Hoc Lender Group executed the RSA, which provides for between $0.00 and $40 million in cash or reorganized equity to preferred and common shareholders under certain conditions.

15.     On June 13, 2021, Debtors filed chapter 11 (the "Petition Date").

I.      **The Curious Circumstances Leading to the Signing of the RSA**

16.     The Debtors concede that their demand for an expedited timeline is based not on true exigencies, but rather to comply with the "timeframe contemplated by the milestones in the Restructuring Support Agreement." *Motion* ¶ 15.  The circumstances leading up to the RSA are therefore relevant, which as detailed below, are highly suspect.

17.     Upon information and belief, SVP and the Ad Hoc Lender Group acquired large positions of the Debtors' debt with the goal of gaining control over the enterprise during a

worldwide pandemic. Importantly, through year end 2020, there were no maturity defaults on the Debtors' senior corporate debt, certain of which still have years to be repaid. The 2018 Credit Facility debts mature at time ranging from end of 2021-2023 and the Unsecured Notes mature in 2024. According, there were no impending maturity defaults.

18. According to the Debtors' SEC filings, as of December 31, 2020, the Debtors had $92 million in cash on hand, and as a result, had sufficient liquidity in February 2021 to make their regular interest payment of $23.2 million on the Unsecured Notes. However, the Debtors announced in SEC filings that they "elected to withhold" payment on the Unsecured Notes, perhaps for strategic reasons during their workout negotiations with SVP. If the Debtors truly did not have funds to make these payments, then it is utterly shocking that on February 12, 2021, just three days prior, the Debtors decided to prepay executive bonuses to the tune of approximately $11.6 million. *See*, WPG Form 8-k dated February 12, 2021.

19. As of at least February 15, 2021, the Debtors appear to have been in negotiations with SVP regarding a restructuring. Around this period, it appears that members of the Ad Hoc Lender Group and/or SVP, in addition to amassing an alleged control position in the Debtors senior and unsecured notes facilities, acquired a relatively small $65 million loan known as the Weberstown Loan, which matured in June 2021. This loan acquisition, along with the Debtors' decision not to make the interest payment on the Unsecured Notes, created a domino effect of cross defaults (curable in chapter 11) which has led the company to where it is today.

## II.    The Limited Pre-Petition Marketing Process

20. The Debtors contend that "the Assets have been subjected to an extensive prepetition [] marketing process," (*Motion* ¶ 24). This statement is misleading, at best. Discovery recently provided shows that the pre-petition marketing process for the enterprise was woefully deficient, and only started in earnest in early June, just days prior to the Petition Date. This is no surprise,

8

given the months' long negotiation of the RSA with SVP and the Ad Hoc Lender Group.  For all purposes below, it is important to highlight that, during the following "marketing process," no teasers, offering memoranda or similar marketing materials were prepared or provided to prospective bidders, which is atypical for an investment bankers "marketing" process.

21. █████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
██████████████████.

22. █████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
█████████████████████

4837-6534-0145.1

23.     On June 11, 2021, the Debtors SVP and the Ad Hoc Lender Group executed the RSA.

24.     ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

25.     According to the Motion, rather than what one would expect to be a robust marketing effort for a company of this size, the Debtors' investment banker only contacted 19 parties of which 13 executed confidentiality agreements. *Motion* ¶ 4.  Obviously, the process was neither "extensive," nor in any manner consistent with a typical sale process for a multi-billion dollar public company.  The process above also reveals material changes over a very short period of time (from first being limited to some assets, ████████████████████, to then the entire company and a minimum cash bid in excess of $2.3 billion).  It is clear that the negotiations over the RSA delayed, and made impossible, any coordinated, well planned marketing process.  The limited post-petition process herein cannot cure these defects.  Instead, the remedy is more time and a more fulsome marketing endeavor, neither of which pose any risk to the Debtors resurging business.

## III.   The RSA and its Proposed Equitization Restructuring

26.     The RSA, in essence, provides for two alternative chapter 11 plan scenarios. The first is an "equitization restructuring."   Under the equitization restructuring, general unsecured creditors are to be paid in full on the effective date while lenders will receive new equity on account

of their claims. The equitization restructuring reserves up to $40 million for equity, subject to multiple coercive "deathtraps" as follows:

(a)     if the class of holders of the Debtors' preferred equity (the "<u>Preferred Holders</u>") vote against the Plan, there will be no recovery for equity;

(b)     if Preferred Holders' class votes in favor of the Plan, and the class of holders of the Debtors' common stock (the "<u>Common Holders</u>") also vote in favor of the Plan, then $20 million of new equity will be payable to the Preferred Holders and $20 million of new equity will be payable to the Common Holders.

(c)     if the Preferred Holders' class votes in favor of the Plan and the Common Holders' class votes against, the Preferred Holders will be entitled to $40 million of new equity and the Common Holders receive nothing.

27.     Under the "toggle restructuring" alternative, there is a "go shop" marketing process contemplated by the Bidding Procedures.

28.     On June 14, 2021 the Debtors filed the instant Motion which proposes the following timeline for the marketing, bidding and ultimate confirmation process as part of the toggle restructuring:

| Date and Time (all times in Central Time) | Event or Deadline |
| --- | --- |
| August 4, 2021, at 4:00 p.m. | Bid Deadline |
| August 5, 2021, at 4:00 p.m. | Deadline to notify all Qualified Bidders of the highest or otherwise best Qualified Bid and provide copies of the |
| | Documents supporting such Bid to all Qualified Bidders and the Consultation Parties. |
| August 6, 2021, at 9:00 a.m. | Auction (if required) |
| August 9, 2021, at 4:00 p.m. | Deadline for objections to approval of any Bid (including any credit bid), including objections based on the manner in which the Auction was conducted and the identity of the Winning Bidder, whether submitted prior to, on, or after the Bid Deadline. |
| August 12, 2021 | Confirmation Hearing (subject to a possible 2 week extension) |
| August 27, 2021 | Effective Date |

4837-6534-0145.1

## **OBJECTION**

29.     Courts have made clear that while a debtor's business judgment is entitled to substantial deference, such business judgement must uphold fiduciary duties owing to both creditors <u>and</u> equity holders alike. *See, e.g.*, *In re Institutional Creditors of Continental Air Lines, Inc. v. Continental Air Lines, Inc., et al. (In re Continental Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or a debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business.").   The paramount goal of any bidding procedures or proposed sale involving property of the estate is to maximize the proceeds received by the estate.  *See In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate."); *In re Food Barn Stores, Inc*., 107 F.3d 558, 564–65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the [Bankruptcy] Code [is] to enhance the value of the estate at hand."); *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc.* (*In re Integrated Res., Inc*.), 147 B.R. 650, 659 (S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law that the objective of the bankruptcy rules and the [Debtor]'s duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (citation omitted).

30.     To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and, therefore, are appropriate in the context of bankruptcy transactions. *See In re Integrated Res., Inc*., 147 B.R. at 659 (bidding procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets"); *In re President Casinos, Inc.*, 314 B.R. 784, 786 (Bankr. E.D. Mo. 2004) ("Structured bid procedures should provide a vehicle to enhance the bid process and should not be a mechanism to chill prospective bidders' interests.").

31.     Importantly, as cited by the Debtors, "court-imposed rules for the disposition of assets . . . **[should] provide an adequate basis for comparison of offers**, and [should] provide for a fair and efficient resolution of bankrupt estates"). *Motion* ¶ 23 (citing *In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991)) (emphasis added).

32.     Courts must safeguard the bidding and sale process and approve only those procedures that will not chill bidder participation in the sale process.  Courts will not approve bidding procedures that "undermine principles of fair play," because "unless the bidding process remains fair and equitable, competitors will refrain from the type of full participation that is needed to assure bids for the highest reasonable value."  *In re Jon J. Peterson, Inc.*, 411 B.R. 131, 137 (Bankr. W.D.N.Y. 2009); *see also, In re Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2010) (bidding procedures must not give "an advantage to a favored purchaser over other bidders by increasing the cost of acquisition.").

33.     For the reasons described below, the Bidding Procedures are unreasonable, unfair and would hamper competitive bidding, and should be modified by this Court.

I.      <u>**The Expedited Timeline is Entirely Manufactured, and Unnecessarily Fast for This Large, Complex Case.**</u>

34.     *First*, the Bidding Procedures fail to provide a reasonable timeline to ensure an effective and competitive process between the current Plan Sponsor and other potential bidders. The August 4 bid deadline is only fifty one (51) days from the filing of the Motion and falls during the midst of the summer months. ████████████████████████████████ ████████████████████████████████████. Such short periods of diligence would not even be reasonable or appropriate for a single asset real estate case, let alone a case of this size and complexity.

35.     The Debtors are a large, publicly traded REIT that own 102 properties representing approximately 52 million square feet of gross rentable real estate spread across the country, along with other complex assets and joint venture interests.   The Debtors have nearly $4 billion in secured and unsecured debt (with both corporate and property level mortgages), multiple classes of publicly traded preferred equity, and publicly traded common equity, all subject to complex REIT rules and limitations, as well as complex tax rules governing REITs.

36.     Given the nature and breadth of the Debtors' assets, the limited pre-petition[5] and post-petition marketing makes any bid that maximizes value virtually impossible.   The Debtors have at least three distinct and different types of assets in their portfolio, with thousands of tenants and/or leases to be diligence by third parties.   To maximize value, some of these assets are required to be re-developed and/or re-positioned. Such a large, divergent asset portfolio may require multiple buyers which the Bidding Procedures effectively make impossible to assemble.

37.     The Debtors own "Open Air Properties," "Enclosed Properties," as well as a group of "non-core" Enclosed Properties. There are very different buyers and strategies for enclosed malls versus open air centers and marketing must be tailored to both potential sets of buyers with attendant time given for buyers of these different asset classes.

38.     The Debtors also have significant joint venture assets, co-owned with another party, O'Connor.   The Debtors interest in the "O'Conner Joint Venture I" includes 5 retail enclosed properties and related outparcels and the "O'Connor Joint Venture II", which owns seven open air properties and related outparcels, along with debt instrument(s) encumbering same.   The Debtors

---

[5] As noted, though the Debtors assert that they "invested substantial time and effort into the prepetition marketing process," they concede that they only contacted 19 bidders. The Debtors, moreover, are conspicuously opaque in the Motion about the scope and timing of their marketing activities.

manage the day to day operations, leasing, and development responsibilities fort these joint ventures.

39.     Only an orderly sale process, with sufficient and additional time, can maximize values of this disparate, geographically diverse, set of assets.

40.     For some scale of reference, in their November 5, 2020 SEC Form 8-K, the Debtors announced the sale of <u>one</u> property, for land development in at the Westminster Mall (the "<u>Westminster Sale</u>").  That contract is for a sale price of $160 million with buyer Taylor Morrison of California, LLC. The contract was signed in November 2020, with an additional deposit of $22,500,000 due on or around July 13, 2021. As noted in the 8-K, "[the Company expects to close on the transaction described herein <u>in the second half of 2022, subject to diligence, entitlements, and customary closing requirements</u>." (emphasis added).

41.     In context, a sale of one piece of property in the Debtors' portfolio will take 18 to 24 months or more from signing to closing. How, then, can the Debtors justify a process that requires bids for 102 properties, fully executed documents, and more than $2.3 billion in cash, due in just 51 days?  The answer is that they cannot. Moreover, the Westminster Sale is an example of perhaps the best way to maximize value, namely, an orderly sale of select properties, over time, which can generate cash and right size the capital structure, without the transfer of the entire enterprise to SVP in an unnecessary fire sale.

42.     The Motion has not cited any precedent REIT cases which have had such the expedited deadlines requested in the Motion.  The Ad Hoc Preferred Committee has reviewed the timelines in other REIT cases which evidence far more appropriate timelines to maximize value and allow for an orderly and fair sale and/or plan process.  A survey of other REIT sale and/or plan transaction processes and marketing periods is below:

| Case | Petition Date | Commencement of Marketing Effort | Stalking Horse/Bid Procedures Motion Filed | Qualified Bid Deadline | Days Between Petition Date and Bid Deadline |
|---|---|---|---|---|---|
| MSR Resort Golf Course LLC[6] | February 1, 2011 | April 2011 | December 2, 2011 (Doral Resort)<br><br>August 7, 2012 (Remaining Properties) | February 2012 (Doral Resort)<br><br>August 7, 2012 (Remaining Properties) | ~365 Days (Doral Resort)<br><br>553 Days (Remaining Properties) |
| Eagle Hospitality[7] | January 18, 2021 | January 29, 2021 | March 9, 2021 | May 14, 2021 | 116 Days |
| Innkeepers USA Trust[8] | July 19, 2010 | October 2010 | January 14, 2011 | April 25, 2011 | 280 Days |
| Extended Stay[9] | June 15, 2009 | June 2009 | April 15, 2010 | May 17, 2010 | 487 Days |
| General Growth Properties[10] | April 16, 2009 | March 3, 2010[11] | March 31, 2010 | April 19, 2010 | 368 Days |

43.     There is simply no reason or basis to rush a sale other than to ensure the current deal required by the RSA gets approved at a suppressed valuation with no real competition.  Even more so in this unusual case where there are no DIP or cash collateral milestones and an investment grade DIP facility. The Debtors have enough liquidity in the DIP Facility, and the DIP budget not only shows an operating cash flow positive company but also a DIP Budget that only requires use of $75 million of the $100 million facility being offered by the Plan Sponsor and Ad Hoc Lender Group. *See DIP Budget* [Docket No. 23-6].

---

[6] *In re MSR Resort Golf Course, LLC*, No. 11-10372 (SHL) Bankr. S.D.N.Y. [Docket Nos. 733, 881, 920, 1060, 1417, 1567]

[7] *In re EHT US1, Inc.*, No 21-10036 (CSS) Bankr. D. Del. [Dkt Nos. 334-8, 495]

[8] *In re Innkeepers USA Trust*, No. 10-13800 (SCC) Bankr. S.D.N.Y [Dkt Nos. 820-21, 1009]

[9] *In re Extended Stay Inc.*, No. 09-13764 (JMP) Bankr. S.D.N.Y. [Docket Nos. 946, 975]

[10] *In re General Growth Properties, Inc.*, No. 09-11977 (ALG) Bankr S.D.N.Y. [Dkt Nos. 4874, 5145]

[11] Refers specifically to marketing in accordance with the process set forth in the bid procedures motion. Presumably significant marketing outside of that process occurred throughout the case.

4837-6534-0145.1

44.     Moreover, the Motion does not cite any real basis or any authority (in cases with or without DIP/cash collateral milestones) for the proposition that the proposed fast timeline and other procedures are appropriate for ensuring the maximization of value in these cases.

## II.   The "Acceptable Bidder" and "Qualified Bidder" Requirements are Unreasonably Narrow, and Unfairly Tilted in Favor of the Plan Sponsor

45.     Under the proposed Bidding Procedures, a bidder must satisfy numerous conditions to be considered an "Acceptable Bidder" and/or a "Qualified Bidder."  These requirements are substantively objectionable on their own; but they are particularly offensive for the additional reason that the Plan Sponsor is excused from complying with many of these same bid requirements, giving it a competitive advantage that will chill, if not freeze, bidding.

### (A)   The Onerous "Acceptable Bidder" and "Qualified Bidder" Requirements

46.     As a starting point, the Plan Sponsor (SVP) is "deemed an acceptable bidder. (*Motion* n. 10).

47.     All bidders **except SVP** must comply with the following requirements:

a).   Provide a 5% cash deposit;

b).   Each bid "**must be accompanied by executed transaction documents**, including a draft purchase agreement, the form of which will be provided to any Acceptable Bidder by the Debtors prior to the Bid Deadline including exhibits, schedules, and ancillary agreements...pursuant to which the Acceptable Bidder proposes to effectuate the proposed Transaction";

c).   An acceptable Bidder must submit a Qualified Bid that provides for a Transaction accounting for "payment in full **in Cash of at least $2.3 billion**..." which must pay off both a litany of secured <u>and unsecured note claims held by SVP</u> and professional fees of SVP and the Ad Hoc Lender Group in full;.

d).   Pay the Backstop Base Premium of **$27,500,000**;

e).   Payment of more than **$40,000,000** cash amount or New Common Equity (of approximately 6%) to preferred and common shareholders (even though these payments are not required to be made by SVP if preferred equity holders do not accept the "death trap" provisions of the plan, which only triggers payment if the preferred equity class accepts); and

f).  Pay an overbid of **$2,500,000**.

48.     The above rules impose all but impossible hurdles to leap over for any potential bidder, thus eliminating any real chance for competitive bidding and a value maximizing transaction.

**(B)     The $2.3 Billion Cash Bid Requirement is Unfairly Imposed on All Bidders *Except* SVP**

49.     Among the more onerous elements of the Bidding Procedures is the requirement that any potential bidder[12] must pay, **in cash**, "at least $2.3 billion" to be deemed a Qualified Bid– with a footnote stating that such amount is subject to "material change" – an amount SVP is not, nor is required to, pay.  Included in this cash amount must be an agreement to pay, in cash, SVP's unsecured notes in the amount of approximately $720.9 million.  Importantly, bidders must agree to repay these notes even though (i) they are unsecured and (ii) **do not mature until 2024**. *Yale First Day Declaration* ¶ 44. Requiring payment in full in cash by all potential bidders, but not the Plan Sponsor, on the bid deadline is unreasonable and not supported by sound business judgement. This requirement is also tantamount to giving SVP the right to credit bid unsecured debt, which is clearly not permitted under Bankruptcy Code section 363(k) or the Debtors' own bidding procedures, which only allow credit bidding for secured creditors.  *Motion* at 14; *Proposed Bidding Procedures* at § D.  While a secured creditor is entitled to payment in full in a sale (or the right to credit bid), the same is not true for unsecured creditors, who are only entitled to unsecured claims. In this regard, the requirement in the Bidding Procedures to require the repayment of the unsecured notes in full in cash as part of a bid, outside of a plan, under section Bankruptcy Code § 363(b),

---

[12] The Bidding Procedures (§ C., p. 10) provide that "the Debtors reserve the right to… aggregate two or more bids into a single consolidated Bid prior to the Bid Deadline…"  However this reservation of rights, like the marketing process itself, lacks sufficient detail and fails to create clear procedures, or an easy path, for partial bids which, when combined, would still need to exceed the $2.3 billion hurdle.

constitutes an impermissible *sub rosa* plan which cannot be approved. *See In re Gulf Coast Oil Corp.*, 404 B.R. 407, 415, 427-28 (Bankr. S.D. Tex. 2009) ("When the court order approving the sale expands to affect creditors and other parties in interest in a significant way, when it effectively 'short circuits the requirements of Chapter 11 ... by establishing the terms of the plan *sub rosa ...*', the transactions cannot be authorized under § 363(b);" denying section 363 sale prior to confirmation absent showing "that the assets are perishable or that any value will be lost through delay to permit plan confirmation") (*quoting In re Braniff Airways, Inc.* 700 F.2d 935 (5th Cir.1983)).

50.     The $2.3 billion cash amount required by the bidding rules also assumes paying off the 2018 Credit Facility Claims of approximately $997 million and 2015 Credit Facility Claims of approximately $340 million in full in cash, even though SVP is not paying these claims off in full in cash and is instead paying them off over time.  No other bidder is allowed the same opportunity to formulate such a similar bid.

51.     All of the rules described above (and in Section C of the proposed Bidding Procedures) materially increase the cost and impose artificial hurdles on potential bidders and result in unequal and favored treatment that should not be allowed.  Taken together, these rules seem designed to entrench SVP, rather than the Motion's purported goal of eliciting the highest and best bid. *Motion* ¶ 24.

52.     If approved, the Bidding Procedures would lead to a scenario where there are two groups interesting in bidding; one has to pay more than $2.3 billion in cash to qualify; the other -- SVP -- does not.  Such an obviously flawed and inequitable process that gives a material unfair advantage to one bidder should not be approved. *See In re Reliant Energy Channelview LP*, 594

F.3d 200, 206 (3d Cir. 2010) (bidding procedures must not give "an advantage to a favored purchaser over other bidders by increasing the cost of acquisition.").

53.     It is axiomatic that this Court has broad authority to reject a bid selected by debtors at the close of an auction process when necessary to maximize value to the estates.  *See In re Fin. News Network, Inc.,* 980 F.2d 165, 169 (2d Cir. 1992) (noting that the bankruptcy court has "broad discretion and flexibility . . . to enhance the value of the estates before it" and circumstances may "justify the exercise of the judge's discretion to refuse confirmation of the highest auction bid") (internal quotations omitted); *see also In re Broadmoor Place Investments, L.P.,* 994 F.2d 744, 746 (10th Cir. 1993) (noting that the bankruptcy court has "the power to disapprove a proposed sale recommended by the trustee or the debtor-in-possession if it has an awareness there is another proposal in hand which, from the estate's point of view, is better or more acceptable"); *In re Farmland Industries, Inc.,* 289 B.R. 122, 126 (B.A.P. 8th Cir. 2003) ("A bankruptcy court has considerable discretion in approving asset sales and is granted ample latitude to strike a balance between fairness, finality, integrity, and maximization of assets.").

54.     Ensuring that the process remains fair and equitable to all parties requires the Court to disapprove bidding procedures that provide a right to one party while "deny[ing] those same rights to every other bidder."  *See In re Jon J. Peterson*, 411 B.R. at 137.  The Court should do so here, as the Plan Sponsor has been given an unfair advantage by not being held to the same form of cash bidding rules and instead is bidding largely with assuming, terming out maturities, or reinstating debts.

### (C)     Alternate Bids Are Both Required and Contemplated by the "Fiduciary Out"

55.     The narrow and onerous Acceptable Bidder requirements are highly problematic for the additional reason that the Debtors have handcuffed themselves with Bidding Procedures that do not allow for an appropriate mechanism of comparison of alterative bid structures; instead,

they allow for only one kind of bid for interested parties: cash.  This leaves the Debtors with little to no flexibility or ability to maximize value <u>or exercise their fiduciary duties</u>.

56.     The Bidding Procedures should be flexible enough to allow alternative structures of bids, both on similar terms as the SVP bid, as well as in other formulations.  The Bidding Procedures must allow the Debtors' board of directors to exercise its fiduciary duties to consider and respond to <u>all </u>value maximizing proposals, not just the one form of bid mandated by the RSA.

57.     The size and complexity of the Debtors business and complicated REIT and tax rules and regulations do not fit within a "one size fits all" transaction or one kind of bid.  Indeed, Debtors themselves note in the Motion that the preliminary indications of interest include proposals for "pieces of the Debtors' property portfolio." (Motion ¶ 4).  Under their own Bid Procedures, however, such proposals could not be considered!

58.     The Debtors and potential bidders need flexibility to achieve the "highest or best" alternative to the estate and its stakeholders.  *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc.* (*In re Integrated Res., Inc.*), 147 B.R. 650, 659 (S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law that the objective of the bankruptcy rules and the [Debtor]'s duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (citation omitted).

59.     The Bidding Procedures should be modified to allow the board to review alternative bid structures (and alternative plan structures), which is consistent with both fiduciary duties and the "fiduciary out" in the RSA and Bidding Procedures, which allow the Debtors to "consider, respond to, **and facilitate alternate proposals** or other restructuring transactions involving any or all of the Asserts (each an "<u>Alternative Proposal</u>"). *Proposed Bid Procedures* § F (emphasis added).

60.     Accordingly, the Bidding Procedures must, consistent with the "fiduciary out", permit allow for any "Alternative Proposal" construct and not impose impossible bidding requirements described above.  *See In re President Casinos, Inc*., 314 B.R. 784, 786 (Bankr. E.D. Mo. 2004) ("Structured bid procedures should provide a vehicle to enhance the bid process and should not be a mechanism to chill prospective bidders' interests.").

61.     For the reasons above, the lack of robust marketing, truncated time period, at least $2.3 billion "all cash" requirement, and a punitive and chilling $65 million Backstop Termination Premium that would be triggered (see below), the "fiduciary out" is wholly illusory in this case.

**(D)     Requiring Fully Executed Transaction Documents by the Bid Deadline is Unreasonable**

62.     Under the circumstances and proposed timing, it is unreasonable to require bids be accompanied with "executed transaction documents…including exhibits, schedules, and ancillary agreements."  This rule would impossibly require not only due diligence of the Debtors' large, complex business, but also the drafting, execution, and delivery of even ancillary transaction documents, all by the bid deadline.  This requirement is designed solely to freeze any other bidders and entrench SVP.

**(E)     The Backstop Base Premium and Backstop Termination Premium Are Unreasonable**

63.     Finally, though not disclosed in the Debtors' Bid Procedure motion, the Bidding Procedures also contemplate an unreasonably high $27.5 million termination fee for the "Backstop Base Premium," and incredibly, a $65 million termination fee for the "Backstop Termination Premium." These break-up fees should have been included in the Debtor's Bid Procedures Motion, as they are fees that any bidder will have to pay to SVP, on top of the $2.3 billion of cash noted above.

22

64.     As will be set forth in the forthcoming Ad Hoc Committee's Objection (the "Backstop Objection") to the *Debtors' Motion for Entry of an Order (I) Authorizing Entry into the Backstop Commitment Agreement; (II) Approving the Payment of Fees and Expenses Related Thereto, and (III) Granting Related Relief (*the "Backstop Motion"), incorporated herein by reference, the typical termination fee using the ranges provided by the Debtors is 5.1% of the total rights offering.  In this case the $27.5 million Backstop Base Premium that any bid must cover is 8.5% of the backstopped amount of the rights offering.  The $65 million Backstop Termination Premium equates to a whopping 20% of the size of the rights offering. However, as detailed in Backstop Objection, based on SVP holdings, SVP is only effectively backstopping 16% of the rights offering.

65.     These break-up fees are excessive and unreasonable, and act as yet another obstacle to fair and value maximizing bidding process.

## **CONCLUSION**

66.     The Ad Hoc Committee respectfully requests that the Court deny the Motion and grant such other relief as is just and proper.

*[Remainder of page intentionally left blank]*

Respectfully submitted this 6th day of July, 2021.

**GRAY REED**

By: */s/ Jason S. Brookner*
    Jason S. Brookner
    Texas Bar No. 24033684
    Lydia R. Webb
    Texas Bar No. 24083758
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
Telephone:  (713) 986-7000
Facsimile:  (713) 986-7100
Email:      jbrookner@grayreed.com
              lwebb@grayreed.com

      -and-

**OLSHAN FROME WOLOSKY LLP**
    Adam H. Friedman (pro hac vice)
    Jonathan T. Koevary (pro hac vice)
    Adrienne M. Ward (pro hac vice)
    Lori Marks-Esterman (pro hac vice)
1325 Avenue of the Americas
New York, New York 10019
Telephone: (212) 451-2300
Facsimile: (212) 451-2222
Email:  afriedman@olshanlaw.com
        jkoevary@olshanlaw.com
        lmarksesterman@olshanlaw.com
        award@olshanlaw.com

**COUNSEL TO THE AD HOC COMMITTEE
OF PREFERRED SHAREHOLDERS**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on July 6, 2021, a true and correct copy of the foregoing document was served electronically by the Court's CM/ECF system on all parties entitled to such notice.

                  */s/ Jason S. Brookner*
                  Jason S. Brookner

**<u>EXHIBIT A</u>**

**[filed under seal]**

# **EXHIBIT B**

**[filed under seal]**

## **EXHIBIT C**

**[filed under seal]**